## Case No. 3,149.

### CONYERS v. ENNIS et al.

[2 Mason, 236.][1]

Circuit Court, D. Rhode Island. June Term, 1821.

STOPPAGE IN TRANSITU—INSOLVENT VENDEE—FRAUD.

1. The right of a vendor in cases of insolvency, to stop goods for non payment of the purchase money, is confined to cases, where the goods are still in transitu to the vendee.

2. If goods are ordered by the vendee who is then insolvent, but uses no device or fraud to deceive the vendor, and afterwards and before the consignment of the goods. the vendee dies, and his estate is represented insolvent, and the goods are afterwards sent by the vendor without knowledge of the facts, and arrive and are taken possession of by the administrators of the vendee, the vendor cannot reclaim the property or its proceeds, upon the ground of the insolvency.

3. Quere, how it would be, if there was a fraudulent representation of solvency, or a fraudulent suppression of insolvency?

A bill in equity [by Conyers and another against William Ennis and others, administrators of Lewis Rousmaniere, for the payment of the cost of a quantity of rice purchased by the intestate, out of the proceeds of the rice in the hands of defendants] which was set down by consent for a hearing upon the bill and answer.

Mr. Hunter, for plaintiff.
Mr. Randolph, for respondents.

STORY, Circuit Justice. This is a case of extreme hardship, and such as might well induce a court to strain after some mode of redress. The cause has come on upon the bill and answer, and the material facts are these: The intestate, Lewis Rousmaniere, a merchant of Newport, being deeply and fraudulently insolvent, on the 4th of May, 1820, wrote a letter to the plaintiffs, who are merchants in Charleston, S. C., and with whom he had previously done business, containing an order for the purchase and shipment of 30 casks of rice on his own account, from Charleston to Newport. On the 6th of May, the intestate, in consequence of the discovery of his frauds, committed suicide. The letter of the 4th of May, duly reached the plaintiffs, who, on the 16th of May, shipped the 30 casks of rice consigned to the intestate on his own account and risk, and drew a bill on the intestate for the amount, in $500 73, payable at 30 days sight. The rice duly arrived at Newport, on the 24th of May, and was received and freight and charges paid by the defendants, who had previously taken administration on the estate of Rousmaniere, and represented it in-

[1] [Reported by William P. Mason, Esq.]

solvent, according to the laws of Rhode Island. On the evening of the day in which the rice was received by the defendants, a letter arrived by the mail. from the plaintiffs, containing an invoice of the rice, and advising of the draft drawn for payment. Upon the presentment of the draft, the defendants refused payment, and it was duly protested. The rice was sold by the defendants, and the present bill is brought to obtain payment of the cost of the rice, out of the proceeds in the hands of the defendants. The defendants' answer admits, that at the time of the order, the intestate must have been insolvent, but that whether that fact was then known to him, they are unable to say; and it states, that the defendants are ignorant of any representations made by the intestate to the plaintiffs of his ability to comply with his engagements, and if he made any, whether he made them being himself deceived as to his pecuniary circumstances, or with a view to deceive the plaintiffs. It farther states, that the intestate to the day of his death, was actually engaged in business, and was in the daily receipt and payment of considerable sums of money.

The principal point, which under these circumstances, has been pressed at the bar, is, that the right of a consignor to stop property in cases of insolvency, ought not to be confined to stoppage in transitu, but in equity should extend to all cases where the property is not paid for, and remains in the hands of the consignee. It is admitted, that the decisions in England have confined the right of stoppage to cases where the property is in its transit. But it is suggested, that the point has not been solemnly adjudged in the United States, and that it is open for the court to adopt the more enlarged rule, hinted at by Lord Hardwicke, in Snee v. Prescott, 1 Atk. 245. His lordship there says, "Though goods are even delivered to the principal, I could never see any substantial reason, why the original proprietor, who never received a farthing, should be obliged to quit all claim to them, and come in as a creditor only, for a shilling perhaps in the pound, unless the law goes upon the general credit the bankrupt has gained, by having them in his custody." The reasoning, too, of Lord Loughborough, in Mason v. Lickbarrow, 1 H. Bl. 357, is brought in aid of the same doctrine. All argument of this sort is addressed in vain to this court. I do not sit here to revise the general judgments of the common law, or to establish new doctrines, merely because they seem to me more convenient or equitable. My duty is to administer the law as I find it; and I have not the rashness to attempt more than this humble discharge of duty. Nothing is better settled, if an uninterrupted series of authorities can settle the law, than the doctrine, that the vendor in cases of insolvency, can stop the property only while it is in its transit. If it has once reached the consignee, there is an end

of all right to reclaim it as a pledge for the payment of the purchase money. If the doctrine were to go the length now contended for, it is far from certain that it would promote public convenience or policy. Where could we stop? Could it be applied with safety to purchases made at any distance of time, if it should turn out in the event, that the buyer was then insolvent? It is very true, as has been stated at the bar, that our law respecting the distribution of the estates of persons dying insolvent, differs from that of England, where the assets are marshalled, and payment goes according to the dignity of the debt. Here, all debts are paid pari passu. This, however, affords no ground to change the general rights and duties of vendor or vendee, or to create relations between debtor and creditor hitherto unknown to the law. The cases arising under the bankrupt laws, are not in principle unlike those which arise here under insolvencies. And the bankrupt laws furnish no instance of an attempt to establish any doctrine like that now sought from the court. It is sufficient for me to stand upon the law, as it is now universally received. If there are public mischiefs growing out of its principles, let them be remedied by the legislature.

The only point of view, in which it seemed possible to sustain the plaintiffs' bill, struck me at the argument to be, that there was a meditated fraud and concealment practised on them by Rousmaniere. If the latter had by false affirmations and contrivances, imposed upon the plaintiffs, and induced them to send him the property, there might be reason to say, that the contract was ab origine void for fraud. And the question then would be, whether the suppressio veri, under the strong circumstances of the present case, was not equivalent to the allegatio falsi, since the imposition as to the intestate's insolvency was complete. If a man, knowing his own insolvency and utter incapacity to make payment, purchases goods of another, who is ignorant of any change of his circumstances, and sells them under the most implicit belief of the good faith and solvency of the buyer, in what respect does the transaction differ from a direct affirmation by the buyer of his own good faith and solvency? If the buyer conceals a fact that is vital to the contract, knowing that the other party acts upon the presumption that no such fact exists, is it not as much a fraud, as if the existence of such fact were expressly denied, or the reverse of it expressly stated?

Upon looking more attentively to the facts of this case, strong as at first blush they seem to be, I do not think they establish a case of meditated fraud. The intestate was in full business as a merchant, and there is no reason to suppose, that he did not expect still to keep on in business. It is admitted at the bar, that the accidental discovery of his fraudulent conduct led to the unhappy catastrophe which terminated his life, and he might have been able and have intended fairly to pay for the rice in question at the time when payment should become due. The sum was not so large as not to be completely within the ordinary means of a merchant. At all events, the bill does not pointedly put the case as one of meditated fraud and imposition; and so far as any conclusion to this effect might be drawn from the facts, it is repelled by the answer.

I do not say, that the suppressio veri, if made out in this case, would have sustained the plaintiffs' bill, even if it were a concealment of positive and deep insolvency, no device or contrivance having been made use of to deceive the plaintiffs. That is a question with which we need not at present intermeddle; and sufficient unto the day is the evil thereof. In the case now before the court, there is no pointed averment of such fraudulent concealment to cheat the plaintiffs; and if it had been averred, no attempt has been made to sustain it by proof; and without proof no court of justice ought to presume it, unless the presumption from the other facts, be direct and irresistible. Let the bill be dismissed with costs.