CHAPMAN and SCHOOLCRAFT *against* LATHROP.

TROVER for a hogshead of rum, a hogshead of sugar, and a box of rasins, tried at the *Albany* circuit, *September* 15, 1824, before DUER, C. Judge.

The following facts appeared at the trial : on the 6th, of *May*, 1824, the defendant called at the plaintiff's store, and inquired for the articles in question. Being informed by *Schoolcraft*, one of the plaintiffs, that he had them, the defendant told him to put them as low as he could, and he, the defendant, would pay for them in cash, or current bills. *Schoolcraft* replied that, on those conditions, he would sell them as low as he could. On the same day, the goods were delivered to the defendant, who took them to his store on carts. The next day the defendant's clerk called on the plaintiffs to pay for them ; and offered a note which had been endorsed by the plaintiffs, and regularly protested, proposing to pay the balance in cash. The plaintiffs refused to receive the note ; and about a fortnight after demanded the property of the defendant, which he refused to deliver.

But if he deliver without payment, the property passes, and the condition is waived ; and tho' the vendee afterwards refuse to pay, trover will not lie for the goods.

Otherwise, it seems, where they are obtained by the fraudalent contrivance of the vendee.

The note had been drawn by one *Northrop*, payable to the plaintiffs, or order ; and was endorsed by them to *Isaiah Shaw*. It was given for horses purchased of *Shaw*, which *Northrop* took to *Boston*, and there delivered them to one of the plaintiffs. The note had been discounted at the *Albany* bank ; and taken up by *Shaw* after protest.

If the goods be delivered without payment, the vendee may avail himself of a set off against the vendor. *Per Savage*, Ch. J. delivering the opinion of the court.

The defendant offered to prove that the plaintiffs had endorsed notes to a large amount for *Northrop*, had received from him the property purchased with those notes, and then stopped payment, with the avowed intention of preventing the holders from collecting them.

This testimony was objected to, and overruled.

If the vendee become bankrupt, the vendor may stop the goods *in transitu*. *Per Savage*, Ch. J. delivering the opinion of the court.

The judge left two questions to the jury, 1. whether the goods in question were sold, on the understanding that they were to be paid for in cash or current bank bills; 2. whether the plaintiffs were induced to part with the goods on the misrepresentations or deceptions of the defendant; and under circumstances against which common prudence could not guard ; and that in either case the plaintiffs were entitled to a verdict. To this charge the defendant excepted.

Verdict for the plaintiffs, for $213,97, the value of the goods, with interest.

*I. Hamilton*, now moved for a new trial. He insisted that the goods were delivered pursuant to a fair contract, and that assumpsit should have been brought. The delivery vested the property. (*Br. Contract, pl.* 26. *Shep. Touch.* 224. *Noy's Max.* 88. 1 *Salk.* 113. 7 *East*, 558, 571. 14 *John.* 167. 2 *Com. on Contr.* 210, 212, 221, 231 *to* 233. 3 *B & P.* 584.) If the opposite doctrine be allowed, which seeks to avoid all cash sales, followed by delivery, where the money is not paid, the situation of purchasers must be very insecure. If void as to the immediate vendee, it is so as to the most remote. The delivery without payment gave a credit to the vendee. (4 *Rep.* 119 *b. Cooke's B. L.* 447, *ch.* 8, *s.* 18. 5 *T. R.* 231. 3 *Cowen's Rep.* 84.) It was a waiver of the cash payment. (1 *East*, 375.) To save the lien, the delivery itself should have been conditional, as in *Hussey* v. *Thornton*, (4 *Mass.* 405.) Security might have been demanded at the time. There are not only many direct authorities ; but the whole doctrine of stoppage *in transitu* shows, that the very moment goods reach the hands of the vendee, or his agent, the right to reclaim them is gone. (3 *B & P.* 584. *Cowp.* 294. 8 *T. R.* 330. 3 *P. Wms.* 186. 12 *John.* 348.) The cases which have gone to the jury upon the validity of the sale, are all cases of fraud. Such was *Hollingworth* v. *Napier*, (3 *Caines*, 183 ;) *Hunn* v. *Bowne*, (2 *id.* 38 ;) and *Allison* v. *Matthieu*, (3 *John. Rep.* 235.)

The testimony offered by the defendant, and overruled, should have been received. It went to show that the plaintiff had not been damnified. The measure of damages in trover is not always the value of the goods. (5 *Mass. Rep.* 104, 5, 6.) The note of the party was equivalent to cash; and better than bank bills. (5 *Mass. Rep.* 299.) An individual as well as a bank is bound to take his own notes in payment. Promissory notes are often considered as cash. (8 *John.* 206. 11 *id.* 468.)

Demand and refusal is no evidence of a conversion, where there is a good excuse for not complying with the demand. (5 *Burr.* 2826.)

*S. S. Lush*, contra, cited *Allison* v. *Matthieu*, (3 *John. Rep.* 235;) *Ogden and Murray* v. *Burling*, (10 *id.* 172, per *Thompson, J.* ;) *Hunn* v. *Bowne*, (2 *Caines' Rep.* 38;) and *Van Cleef* v. *Fleet*, (15 *John.* 147.)

He said these cases, together with that of *Woodworth* v. *Kissam*, (15 *John.* 186,) establish beyond all doubt, that where the creditor obtains possession of his debtor's goods by fraud, the property is not changed; and the debtor may maintain trover for them : and that what circumstances are necessary to make out the deception, are matter for the jury. He also cited *Parker* v. *Norton*, (6 *T. R.* 695.)

In *Palmer* v. *Hand*, (13 *John.* 434,) the doctrine is explicitly laid down, that where goods are to be paid for on delivery, the vendor has a lien ; so that if they be actually delivered to the vendee, and, on demand, he refuses to pay, the property is not changed, *the delivery being conditional.*

The testimony offered by the defendant, and rejected by the judge, was irrelevant.

*Hamilton*, in reply, said, that *Palmer* v. *Hand* was a case of gross fraud ; and there was no actual delivery or acquiesence by the vendor, as in the case before the court.

*Curia*, per SAVAGE, Ch. J. The principal question is, whether trover will lie upon the facts proved.

If there was a fair contract for the goods, and they were delivered to the purchaser, without any fraudulent contrivance on his part to obtain possession, the property passed, and the plaintiffs' remedy is by a different action.

It is conceded that the plaintiffs were entitled to pay for the goods upon delivery. They might have refused to part with the goods until payment. Where no time is agreed on for payment, the delivery and payment are to be simultaneous acts. But if the vendor delivers the goods to the vendee, and the latter omits to pay, the property of the goods is changed. If the vendee becomes bankrupt, while the goods are on their passage, but before actual delivery, the vendor may stop them *in transitu.* (2 *Com. on Contr.* 221. *Cook. Bankr. L.* ch. 8, *s.* 17, 18.)

In case of an agreement to pay down for goods, if the vendor deliver the goods without actual payment, the vendee may avail himself of any legal set off, notwithstanding the agreement to pay ready money. (*ibid.* 1 *East*, 375.)

In *Hussey* v. *Thornton*, (4 *Mass. Rep.* 405,) the plaintiffs had agreed to sell a quantity of candles to *T. & W.* on credit, and on their giving security. The agent of *T. & W.* received the candles on board a vessel through the hands of cartmen sent by him. While part of the candles were on the wharf, and part on board the vessel, one of the plaintiffs appeared, and said he should consider the candles the property of the plaintiffs, until security was given ; to which the agent assented. These candles were attached by the defendants as the property of *T. & W.* ; and the qustion was, whether they were so. *Parsons,* Ch. Justice, states the inquiry to be, whether this was an absolute delivery, not revocable ; or, if revocable, yet not revoked. " We think," said he, " they (the plaintiffs) were bound to recollect the condition they had themselves made ; and not to have delivered the candles until it had been complied with." The court, however, decided the cause, on the ground that the agent had accepted of a conditional delivery ; and therefore the property remained in the vendors. But the decision would have been different,

if the goods had been sold or attached while in possession of *T. & W.* According to the doctrine of this case, the absolute delivery of the property is a waiver of any condition antecedently made.

In *M'Carty* v. *Vickery*, (12 *John.* 348,) this court decided that trespass would not lie, where the vendor had parted with the possession, even though by fraud. They add, the property was changed by the delivery.

In 5 *T. R.* 231, Mr. Justice *Buller* cites the case of *Haswell* v. *Hunt*, where *Lacey*, in the morning, purchased some tobacco of the plaintiffs, to be paid for in cash; and then went off to *France* to absent himself from his creditors. The tobacco was delivered by the plaintiffs' servants, at *Lacey's* house, without demanding the money, or having any orders to do it. *Eyre*, Ch. J. held that the sale was made complete by the act of the plaintiffs; that by delivering the goods, without demanding the money, the property was vested in *Lacey* as upon a complete sale *ab initio*, without ready money. That was a much stronger case than the present.

Suppose the plaintiffs' note had never been presented; but that after a fortnight had elapsed, they had sent a bill of the goods, and the defendant had omitted to pay; could it be pretended that trover would lie? If so, the vendor has only to make his contract for cash; and may then pursue the property, whose hands soever it may reach, at any length of time, not barring an action upon the statute of limitations. The proposition is monstrous.

As to fraud, it seems to me, if there be any in the case, it is on the side of the plaintiffs. The judge admitted that the defendant acted under an erroneous opinion of his rights; and yet charged the jury that his conduct might be fraudulent. The fraud, I presume, was that of paying the plaintiffs with their own paper. If that be fraudulent, it must be admitted, that the defendant is guilty. But there is no evidence in the case, shewing that he contemplated making such a payment, when he purchased the goods, or when he received them.

The case of *Palmer* v. *Hand* is not in point. The purchaser in that case never received the delivery of the lumber; but while the hands were piling it, he defrauded the defendant of nearly the value of it, and absconded.

<div style="float:right">

Chapman
v.
Lathrop.

</div>

I find no case which will warrant a recovery in this action; nor is it sustainable upon any principle of law.

I think the judge erred; and there must be a new trial, with costs to abide the event.

<div style="text-align:center">New trial granted. (*a*)</div>

(*a*) There is no doubt that the strong general proposition laid down by *Platt*, J. in *Palmer* v. *Hand*, (13 *John*. 434,) joined with the subsequent case of *Haggerty* v. *Palmer*, (6 *John. Ch. Rep*. 437,) decided by *Kent*, late chancellor, have led the profession generally, to an adoption of the doctrine as stated in Mr. *Johnson's* marginal note to the former case; that "where goods are sold, to be paid for on delivery, if on the delivery being completed, the vendee refuses to pay for them, the vendor has a lien for the price, and may resume the possession of the goods." This case was at law. *Haggerty* v. *Palmer*, in equity, goes about the same length, as between vendor and vendee, and where no *bona fide* purchaser intervenes. No case is cited in support of either the dictum of *Platt*, J. or the decision of *Kent*, chancellor. But they were very learned and able judges. And as the *dictum* cited is certainly at war with the decision in the principal case, whatever may be said of *Haggerty* v. *Palmer*; and as it is important that a principle of such extensive practical application be as firmly settled as possible, I give below the decision of *Story*, J. in *Conyers* v. *Ennis*, (2 *Mason*, 236.) This case declares the law, as I believe it was held by the profession, till the two decisions cited from *Johnson*, viz. that a fair sale, for cash, or a bill, or other mode of payment at the time; and a delivery, though without payment, passes the property of the goods absolutely, both at law and in equity, even as between vendor and vendee; and that no lien remains for the price. This, I am sure, was the conceded and well established doctrine, at least, in a court of law; and I am not aware that, even in equity, after *transitus* determined, the doctrine of lien for the price was ever applied, till the case of *Haggerty* v. *Palmer*. The question was much discussed in *Warren* v. *Sproule*, (2 *Marsh. Kentucky Rep*. 528, A. D. 1820,) and at p. 536, judge *Owsley*, who delivered the opinion of the court, asserts in terms, and as the clear and settled doctrine, that it is only while the goods are *in transitu*, that the consignor can reteke them, even though the consignee be insolvent; and he denies that the consignor can, after the delivery, have any lien in such a case for the price. The question there was in equity. The case, however, does not determine the point as between vendor and vendee; for the latter had sold to another, who purchased *bona fide*; and would be protected even within the doctrine of *Haggerty* v. *Palmer*.

CONYERS AND ANOTHER *vs.* WILLIAM ENNIS AND OTHERS, ADMINISTRATORS OF LEWIS ROUSMANIERE.

A BILL in equity which was set down by consent for a hearing upon the bill and answer. It was argued by *Hunter* for the plaintiff, and by *Randolph* for the respondents, upon the point stated in the opinion of the court.

STORY, J. This is a case of extreme hardship, and such as might well induce a court to strain after some mode of redress. The cause has come on upon the bill and answer, and the material facts are these : The intestate, *Lewis Rousmaniere,* a merchant of *Newport,* being deeply and fraudulently insolvent, on the 4th of *May,* 1820, wrote a letter to the plaintiffs, who are merchants in *Charleston, S. C.* and with whom he had previously done business, containing an order for the purchase and shipment of 30 casks of rice on his own account, from *Charleston* to *Newport.* On the 6th of *May,* the intestate, in consequence of the discovery of his frauds, committed suicide. The letter of the 4th of May, duly reached the plaintiffs, who, on the 16th of *May,* shipped the 30 casks of rice consigned to the intestate on his own account and risk, and drew a bill on the intestate for the amount, in $500 73, payable at 30 days sight. The rice duly arrived at *Newport,* on the 24th of *May,* and was received and freight and charges paid by the defendants, who had previously taken administration on the estate of *Rousmaniere,* and represented it insolvent, according to the laws of *Rhode Island.* On the evening of the day in which the rice was received by the defendants, a letter arrived by the mail, from the plaintiffs, containing an invoice of the rice, and advising of the draft drawn for payment. Upon the presentment of the draft, the defendants refused payment, and it was duly protested. The rice was sold by the defendants, and the present bill is brought to obtain payment of the cost of the rice, out of the proceeds in the hands of the defendants. The defendants' answer admits, that at the time of the order, the intestate must have been insolvent, but that whether that fact was then known to him, they are unable to say ; and it states, that the defendants are ignorant of any representations made by the intestate to the plaintiffs of his ability to comply with his engagements, and if he made any, whether he made them being himself deceived as to his pecuniary circumstances, or with a view to deceive the plaintiffs. It farther states, that the intestate to the day of his death, was actually engaged in business, and was in the daily receipt and payment of considerable sums of money.

The principal point, which under these circumstances, has been pressed at the bar, is, that the right of a consignor to stop property in cases of insolvency, ought not to be confined to stoppage *in transitu,* but in equity should extend to all cases where the property is not paid for, and remains in the hands of the consignee. It is admitted, that the decisions in *England* have confined the right of stoppage to cases where the property is in its *transit.* But it is suggested, that the point has not been solemnly adjudged in the *United States,* and that it is open for the court to adopt the more enlarged rule, hinted at by Lord *Hardwicke,* in *Snee v. Prescott.* (1 *Atk.*

245.) His Lordship there says, " Though goods are even delivered to the principal, I could never see any substantial reason, why the original proprietor, who never received a farthing, should be obliged to quit all claim to them, and come in as a creditor only, for a shilling perhaps in the pound, unless the law goes upon the general credit the bankrupt has gained, by having them in his custody." The reasoning, too, of Lord *Loughborough*, in *Lickbarrow* v. *Mason*, (1 *H. Bl.* 357,) is brought in aid of the same doctrine.

All argument of this sort is addressed in vain to this court. I do not sit here to revise the general judgments of the common law, or to establish new doctrines, merely because they seem to me more convenient or equitable. My duty is to administer the law as I find it; and I have not the rashness to attempt more than this humble discharge of duty. Nothing is better settled, if an uninterrupted series of authorities can settle the law, than the doctrine, that the vendor in cases of insolvency, can stop the property only while it is in its transit. If it has once reached the consignee, there is an end of all right to reclaim it as a pledge for the payment of the purchase money. If the doctrine were to go the length now contended for, it is far from certain that it would promote public convenience or policy. Where could we stop ? Could it be applied with safety to purchases made at any distance of time, if it should turn out in the event, that the buyer was then insolvent ? It is very true, as has been stated at the bar, that our law respecting the distribution of the estates of persons dying insolvent, differs from that of *England*, where the assets are marshalled, and payment goes according to the dignity of the debt. Here, all debts are paid *pari passu*. This, however, affords no ground to change the general rights and duties of vendor or vendee, or to create relations between debtor and creditor hitherto unknown to the law. The cases arising under the bankrupt laws, are not in principle unlike those which arise here under insolvencies. And the bankrupt laws furnish no instance of an attempt to establish any doctrine like that now sought from the court. It is sufficient for me to stand upon the law, as it is now universally received. If there are public mischiefs growing out of its principles, let them be remedied by the legislature.

The only point of view, in which it seemed possible to sustain the plaintiffs' bill, struck me at the argument to be, that there was a meditated fraud and concealment practiced on them by *Rousmaniere*. If the latter had by false affirmations and contrivances, imposed upon the plaintiffs, and induced them to send him the property, there might be reason to say, that the contract was *ab origine* void for fraud. And the question then would be, whether the *suppressio veri*, under the strong circumstances of the present case, was not equivalent to the *allegatio falsi*, since the imposition as to the intestate's insolvency was complete. If a man, knowing his own insolvency and utter incapacity to make payment, purchases goods of another, who is ignorant of any change of his circumstances, and sells them under the most implicit belief of the good faith and solvency of the buyer, in what respect does the transaction differ from a direct affirmation by the buyer of his own good faith and solvency ? If the buyer conceals a fact, that is vital to the

contract, knowing that the other party acts upon the presumption that no such fact exists, is it not as much a fraud, as if the existence of such fact were expressly denied, or the reverse of it expressly stated?

Upon looking more attentively to the facts of this case, strong as at first blush they seem to be, I do not think they establish a case of meditated fraud. The intestate was in full business as a merchant, and there is no reason to suppose, that he did not expect still to keep on in business. It is admitted at the bar, that the accidental discovery of his fraudulent conduct led to the unhappy catastrophe which terminated his life, and he might have been able and have intended fairly to pay for the rice in question at the time when payment should become due. The sum was not so large as not to be completely within the ordinary means of a merchant. At all events, the bill does not pointedly put the case as one of meditated fraud and imposition; and so far as any conclusion to this effect might be drawn from the facts, it is repelled by the answer.

I do not say, that the *suppressio veri*, if made out in this case, would have sustained the plaintiffs' bill, even if it were a concealment of positive and deep insolvency, no device or contrivance having been made use of to deceive the plaintiffs. That is a question with which we need not at present intermeddle; and sufficient unto the day is the evil thereof. In the case now before the court, there is no pointed averment of such fraudulent concealment to cheat the plaintiffs; and if it had been averred, no attempt has been made to sustain it by proof; and without proof no court of justice ought to presume it, unless the presumption from the other facts, be direct and irresistible.

Let the bill be dismissed with costs.