## CARAWAY v. WALLACE ET ALS.

1. A contract, absolute in its inception, and consummated by delivery of the property, will not be converted into a conditional sale, by an ambiguous phrase afterwards endorsed on it, even if such would have been its effect if a part of the original contract.

2. C. sold to W. certain slaves on credit, and delivered them; and sometime afterwards an agreement was entered into, and endorsed on the contract, by which it was stipulated, that payment should be made within the next month, in the notes of other persons; at which time, *a bill of sale of the slaves* was to be executed by the vendor. *Held*—That this was not sufficient to show that the parties intended to rescind the former sale, and convert it into a conditional one.

3. Where a Court of law can afford adequate relief, Chancery has no jurisdiction.

Error to the Chancery Court at Mobile.

THE bill charges, that on the 27th December, 1836, the complainant entered into a contract with the defendant Wallace,

in writing, for the sale to him, of twenty-seven slaves, for the sum of twenty-nine thousand dollars; and by a subsequent verbal agreement, another slave was added, at the price of twelve hundred dollars, upon the same time, to be paid for as follows : one-half of one-third part in ninety days; one-half of one-third part in four months; and the remaining two-thirds in equal payments, of one and two years, to be computed from the 15th January, 1837. That at the time the agreement was entered into, it was contemplated by the parties that it would be carried into full effect on the 15th January, 1837—That Wallace, at that time, alledged he was unprepared to execute the agreement in full by securing the payment of the purchase money ; but gave his own notes for the two first instalments, and agreed to complete the arrangement in some short time—That thereupon it was agreed between the parties, that the said Wallace should take possession of the negro slaves, with the understanding and upon the condition, that no title was to pass to him for the same, until he had fully secured the amount still due of the purchase money. . About this time complainant received from Wallace two notes, on one S. Andrews of Mobile, amounting in the aggregate to five thousand five hundred and seventeen dollars and thirteen cents. That the matter stood thus, until the 17th February, 1837, when Wallace, being still unprepared to fulfil his agreement, a supplemental agreement was annexed to the original article, to the following effect : " It is understood and agreed by the parties to the within contract, that the amount now due said Caraway, shall be paid to him within the next month in James S. Deas' note, due July 30th, 1838, for four thousand and thirty-six dollars ; his note, due July 30th, 1839, for three-thousand two hundred and ninety-nine dollars and thirty-seven cents ; T. B. Lee's two notes, one due July 30th, 1838, for three thousand nine hundred and fourteen dollars and fifteen cents, and the other due July 30th, 1839, for four thousand two hundred and twenty-two dollars and two cents ; at which time a bill of sale is to be executed to said Wallace by said Caraway." That about the time of the expiration of the month of March after, he repeatedly applied to Wallace to comply with the terms of his agreement.

The bill then charges, that the defendants, Sayre & Converse, having notice of the contract aforesaid, and with knowledge that Wallace was about to become insolvent, procured him to execute a deed of trust to one John A. Campbell, upon a part of the negroes aforesaid, and caused them to be lodged in jail in Mobile. The bill further charges, that the complainant has reason to apprehend that the negroes will be removed beyond the limits of this State; and prays that the slaves be delivered up to him; and for a decree against Wallace for the amount due on the contract for the sale of the slaves. An order was made, that a writ issue to the sheriff to take possession of the slaves, &c.

Sayre & Converse, and Campbell, the trustee, by their answers, deny all knowledge of the conditional sale recited in the bill, or that the complainant had any right or title to them—That they claim the negroes under a deed of trust made to Campbell for their benefit, to secure a debt due from Wallace to them, for cash advanced to him on cotton to be delivered to them—That they intended to sell the negroes in pursuance of the terms of the deed; and from distrust of Wallace, placed the negroes in the jail of Mobile county for safe keeping. They deny any intention of removing the slaves beyond the limits of the State; and demur to the bill for want of Equity.

The deed of trust, which is made an exhibit to the answer, is dated on the 1st April, 1837; and is made to secure the payment, by William Wallace and Joseph Wallace, to Sayre, Converse & Co., of a promissory note, dated the 1st April, 1837, and due thirty days after date, for the sum of seventeen thousand five hundred and nineteen dollars and seventy-five cents. The property conveyed consists of twenty-two negro slaves, besides real estate, and promissory notes of other persons. The deed was only executed by William Wallace and John A. Campbell, and proved to have been executed by Wallace before a notary public.

The bill was taken as confessed as to Wallace.

The agreement between the complainant and Wallace for the sale of the slaves, is to the following effect: "Articles of agreement, this day made and entered into, between G. E. Caraway and William Wallace, both of the city of Mobile.

Witnesseth : That the said Caraway has this day sold to the said Wallace the following twenty-seven negro slaves, to wit, &c. for the sum of twenty-nine thousand dollars, to be paid as follows : one-half of one-third of said sum in ninety days; one-half of one-third in four months ; and the remaining two-thirds, in equal payments of one and two years—said payments to be computed from the delivery of said negroes—said Caraway to deliver said negroes by the 15th January ensuing. Mobile, December 27, 1836. Signed, W. WALLACE."

On which is endorsed: "Rec'd, Mobile, January 14th, 1837, of William Wallace, his two notes of five thousand and sixty-six dollars and sixty-six cents each, at ninety days, and four months, on account of the within contract. The balance to be closed when called on. W. WALLACE,

G. E. CARAWAY."

Also the following : "February 17th, 1837. It is understood and agreed by the parties to the within contract, that the amount now due said Caraway shall be paid to him within the next month in Jas. Deas' note, due July 30th, 1838, for four thousand and thirty-six dollars ; his note, due July 30th, 1839, for three thousand two hundred and ninety-nine dollars and thirty-seven cents ; J. B. Lee's two notes, one due July 30th, 1838, for three thousand nine hundred and fourteen dollars and forty-five cents, and the other due July 30th, 1839, for four thousand two hundred and twenty-two dollars and two cents ; at which time, a bill of sale for said negroes is to be executed to said Wallace by said Caraway.

Signed, W. WALLACE."

There is an agreement on the record, admitting that these agreements between Wallace and Caraway, were made at the time of their respective dates; that they are to be taken as exhibits to the bill, and as duly proved, that the slaves claimed by the trustee are the same as those specified in the said agreement, so far as the number extends; that they were the property of Caraway at and previous to the making of the first agreement ; and that Wallace has become insolvent.

There was no evidence taken by the complainant.

The defendants proved, that the debt, to secure which the deed was made, was due from Wallace for advances made on

cotton, which was not delivered; and also, proved the value of the slaves, the value of their hire, &c.

A decree was entered, dismissing the bill, in the following words: "This case was taken as confessed as to the defendant Wallace; and came on to be heard on the bill, answer and depositions. Mr. Stewart for the complainant, and Mr. Campbell for the defendants. After the argument, and, deliberation had by the Court, the Court is of opinion, that the bill be dismissed. It is therefore considered by the Court, that the bill be dismissed, and that the defendants recover of the complainant the costs. And it is further ordered and decreed, that it be referred to the Master to ascertain the value of the said slaves; and who are the securities to the forthcoming bond; and the amounts which the defendants are entitled to recover against the said complainant and his securities, in the event the said slaves are not delivered according to the condition of said bond. And that he report thereon."

At the fall term, 1839, of the Court, his honor Chancellor Peck made a decree, that the slaves mentioned in the replevin bond, executed by the complainants, be delivered to Sayre, Converse & Co., on demand made by them; that on failure to deliver them, the bond should be held forfeited; and that the defendants might proceed thereon at law.

At the fall term, 1840, his honor Chancellor Bowie presiding, a decree was made, that the decree made by Chancellor Peck at the fall term, 1839, of this Court, be entered as the decree of this Court.

From this decree, the complainant prosecutes this writ of error; and assign for error—

1. The Court erred in dismissing the bill.

2. The Court erred in dismissing the bill upon the bill, answers and depositions.

3. The Court erred in rendering a decree in favor of Wallace.

4. The Court erred in rendering the decree made at the spring term, 1839, dismissing the bill and ordering a reference.

5. The Court erred in rendering the decree, or order, made at the fall term, 1839.

6. The Court erred in rendering the decree of the fall term, 1840.

STEWART & DUNN, for the plaintiff in error, insisted that the sale of the slaves was not absolute, but conditional; and that no property in the slaves passed to Wallace by the delivery; and that Sayre, Converse & Co., are not. *bona fide* purchasers for a valuable consideration; as they received the negroes as collateral security for the payment of an antecedent debt; and cited 2 Kent's Com. 291; 4 Mass. Rep. 405; 17 ib. 606; 2 Pickering 512; 22 Wendell 659; 1 Paige 312; 6 Johns. C. Rep. 437; 10 Wendell 85; 4 Paige 215; 4 Dana 211; 10 Johns. 66; 10 Mass. Rep. 31; 13 ib. 156; 6 ib. 606; 13 Johns. 434; 3 East. 93; 6 Johns. C. Rep. 437; 19 Vesey, Jr. 235; 4 Mason 289; 4 Wash. C. C. Rep. 588; 3 Serg. & Rawle 20; 2 Pickering 512; 20 Johns. 637; 12 Wendell 593.

Mr. CAMPBELL, contra, argued, that the delivery of the slaves was absolute; but that if they were delivered on a condition, as they were permitted to remain with Wallace after a breach of the condition, that the equity of the defendants was superior to that of the plaintiff; and cited 2 Paige 169; same case, 7 Wendell 77; 6 Cowen 110; 2 Mason 236; 6 Pickering 262; 4 Mass. 405; 10 Wendell 85; 12 ib. 593; 14 ib. 575; 9 ib. 170; 10 ib. 85; 13 ib. 570–605; 2 Wheaton 66; 2 Peters 176; 6 Connecticut N. S. 338; 1 Ch. Cases 35; 5 Leigh 147; 5 Eng. Exchequer Rep. 266; 10 Price 766; 7 Vesey, Jr. 293; 2 ib. 164; 4 Johns. C. Rep. 546; 3 Munford 29; 4 Paige 215; 1 Hall 562.

ORMOND, J.—The material questions in this case are—

1. What was the character of the sale of the slaves in controversy, from the plaintiff in error to Wallace—was it an absolute, or conditional, sale?

2. Are Sayre & Converse *bona fide* purchasers from Wallace, and as such, entitled to hold the slaves against the supposed title, or *lien*, of the plaintiff in error.

1. The contract between Wallace and the plaintiff in error for the slaves, was made on the 27th December, 1836; and is to the following effect: "Articles of agreement, this day enter-

ed into, by and between G. E. Caraway and William Wallace, both of the city of Mobile—Witnesseth: that the said Caraway has this day sold to the said Wallace the following twenty-seven negro slaves: Jim, &c., &c., for the sum of twenty-nine thousand dollars, to be paid as follows: one-half of one-third of said sum in ninety days; one-half of one-third in four months; and the remaining two-thirds in equal payments of one and two years, said payments to be computed from the delivery of said negroes. Said Caraway to deliver said negroes by the 15th of January ensuing.

Signed,   W. WALLACE."

Upon this agreement is an endorsement, dated 14th January, 1837: "Received of William Wallace his two notes for five thousand and sixty-six dollars and sixty-six cents each, at ninety days and four months, on account of the within contract; the balance to be closed when called on.

Signed,   W. WALLACE,
G. E. CARAWAY."

It is not necessary to enter upon the inquiry, what the rights of the parties were under this contract, if either had refused to perform it; as the slaves were delivered pursuant to its terms. It does not appear from the contract, that it was intended that Wallace should execute his notes for the several instalments of the debt. Such was, however, perhaps the intention of the parties; as we find that, on the delivery of the slaves within the time stipulated, Wallace executed his notes for the two first payments, and agreed to execute the residue when called on.

This, there can be doubt, was an absolute, unconditional sale of the slaves to Wallace, and vested in him the entire property. It was simply a sale of the slaves on a credit, which was consummated by a delivery, unclogged by any condition, verbal or written; and vested Wallace with the absolute title in the absence of fraud, which is not shown, and does not appear to have existed, as fully as if the entire purchase money had been paid at the time of the purchase.

It was, however, earnestly contended by the learned counsel for the plaintiff in error, that there was, in effect, a rescission of this contract by the agreement of the parties; and that Wallace agreed to receive the slaves on condition of paying for

them in the mode prescribed; and that until such payment, the title should remain in Caraway. The agreement, from which these consequences are supposed to flow, was made on the 17th February, 1837, and endorsed on the original contract. It is as follows: "It is understood and agreed by the parties to the original contract, that the amount now due said Caraway shall be paid to him within the next month, in Jas. Deas' note, due July 30th, 1838, for four thousand and thirty-six dollars; his note, due July 30th, 1839, for three thousand two hundred and ninety-nine dollars and thirty-nine cents; J. B. Lees' two notes, one due July 30th, 1838, for three thousand nine hundred and fourteen dollars and forty-five cents, and the other due July 30th, 1839, for four thousand two hundred and twenty-two dollars and two cents; *at which time a bill of sale for said negroes, is to be executed to said Wallace by said Caraway.* Signed, W. WALLACE."

It is perfectly well established, that where there is a condition precedent attached to a sale, either expressly agreed on, or understood from the usage of trade, the title will not pass until the condition is performed, unless there be an express or implied waiver of its performance by the vendor. (Kent's Com. 1 ed. 391; Haggerty v. Palmer, 6 Johns. C. 437; Lupin v. Marie, 2 Paige 172; 1 Paige 312; 17 Mass. 606; 4 ib. 405. As to the general principle, there is not, and cannot be, any controversy; but as the question is one of intention, the fact whether the vendor *intended* to part with the title of his property before the performance of the condition, or whether he intended to rely on the faith and honor of the vendee for its performance, is frequently one of great difficulty.

It is conceded in this case, that a bill of sale was not necessary to perfect the title of Wallace in the slaves; yet it is contended, that the question being one of intention, any fact which ascertains that intention, no matter how unimportant or unnecessary it may be, will be effectual. Conceding this to be correct, what is the fact in this case?

The parties, as we have seen, had, in the first instance, made a contract, which contemplated the transfer of the property absolutely to Wallace; that this contract was executed by a delivery of the slaves. A little more than one month after-

wards, a memorandum was endorsed on the contract, the whole object of which appears to have been to change the mode of payment, by substituting the notes of other persons for those of Wallace, within a specific time ; and at the close is added, at which time *a bill of sale for the negroes shall be executed.* We cannot think these words potent enough to authorize us to infer, that the parties intended thereby to rescind the contract formerly made, and to change its character from an absolute to a conditional sale of the property, even conced-ing that such would have been their effect if embodied in the original contract. It must be borne in mind, that the vendor was willing, in the first instance, to invest Wallace with the absolute title, and trust to his ability to pay the purchase money without surety, although the last payment was postponed for two years. That he was in possession of the slaves for more than two months, at any moment during which time, he could have sold them and transferred the title ; and that there is no evidence that any reason existed for distrusting the ability of Wallace to pay at this time, which did not exist in January, when the slaves were delivered. In proof of the estimation of Wallace by the mercantile community, as to credit, we find that as late as the 22d and 25th March afterwards, Sayre & Converse advanced to him the sum of twenty-seven thousand dollars on cotton to be afterwards delivered. There is, therefore, no reason shown, why the plaintiff wished to change the character of the contract so as to re-invest him with the title, as must have been done if the contract was changed from an absolute to a conditional one. Nor is it probable that, if such had been the intention, it would have been left to the doubtful interpretation of an ambiguous phrase. The natural course in such a case, if any thing had occurred to alarm the fears of the plaintiff as to the solvency of Wallace, would have been to place the matter beyond doubt, by obtaining from Wallace an explicit declaration to that effect. Courts of justice always endeavor to give effect to the intention of parties to a contract ; and the natural presumption, in a case like the present, should be, that the title was parted with ; as third persons have no means of divining the secret, unexpressed conditions of a contract, whilst the person in possession, by the apparent owner-

ship, acquires a false credit. It is said by Mr. Senator Tracy, in the case of the People v. Haynes, 14 Wendell 566, that to constitute a conditional delivery, the condition should be express. The case of Hussey v. Thornton, 4 Mass. 405, affirms this principle. A quantity of candles had been sold, but doubting the ability of the vendee, the vendor said they would not be delivered without an endorser or security. They were, however, delivered without insisting on the condition, from forgetfulness; but before they were put on board of the vessel, the vendor informed the agent of the vendee, that he should not consider the candles sold until the security was given; and he received them on this condition. Chief Justice Parsons, in delivering the opinion of the Court, held that the vendor was bound to recollect the condition; and that, had the demands of the creditors originated while the goods were in the possession of the vendees, so that it might be fairly presumed that a false credit was given him—or had the vendee sold them, *bona fide*, and for a valuable consideration, the purchaser would have acquired a good title. This is an explicit decision to the point; for if a condition could be implied from the circumstances, it would have arisen in this case. For we find, that although at the time of the sale, a condition was stipulated, yet as the goods were afterwards delivered without exacting its performance, this was held to be a waiver. See also Furriss v. Hone, 8th Wendell 247. The same doctrine is explicitly held in the case of Chapman v. Lathrop, 6 Cowen 110; and see also the note of Judge Cowen to that case, in which the cases of Palmer v. Hand, 13 Johnson 434, and Haggerty v. Palmer, 6 Johns. Chan. 437, are questioned, and are, in effect overruled by the case of Chapman v. Lathrop. See also the case of Conyers and others v. Ennis and others, 2 Mason 236.

It therefore devolves on a party setting up such a claim, to show, beyond a reasonable doubt, that when he parted with the possession of his property, he did not intend to part with the title; and as the only clue to the supposed intention in this case, is the ambiguous clause relating to the bill of sale to be afterwards made, we do not think that alone, unaccompanied as it is by any other circumstance, sufficient to convert a sale which, in its inception, and for the space of a month or more, was

clearly absolute, into one made on condition. During all the time that Wallace was the undisputed owner of the slaves, he acquired a credit thereby; and it would be of most disastrous consequences to hold, that a sale, made under such circumstances, and attended by such results, could be rescinded, and the title re-invested in the original owner, by a secret, ambiguous phrase endorsed on the contract, which the parties might suppress or make known at their pleasure—the possession in the meantime unchanged, and the public without any means of knowing that the title was not where it appeared to be.

For these reasons, we are of opinion that the sale to Wallace was absolute and unconditional; and that he had the right to sell or dispose of the slaves in any manner he thought proper.

This being the case, it is unnecessary to consider the question, so elaborately and ably argued at the bar, whether Sayre & Converse, having taken the conveyance to secure the payment of an existing debt, could be considered as *bona fide* purchasers for a valuable consideration; as that question could only arise on the supposition, that the plaintiff had an equitable lien on the slaves for the purchase money.

It also disposes of the objection, that the bill should not have been dismissed as to Wallace. The sale being an absolute one, and Wallace merely the debtor of the complainant, without the reservation of any lien upon the slaves, the claim was merely legal in its character; and nothing is shown in the bill which could give a Court of Chancery jurisdiction. The allegations of the bill, besides those which alledge those facts from which the equitable lien is suppose to arise, are that the defendants intended to have removed the slaves secretly and clandestinely beyond the jurisdiction of the Court; and pray the issuance of the writ of sequestration; which prayer was granted by the Circuit Judge.

The proper office of the writ of *sequestration*, is to compel an appearance after service of process, or to compel obedience to the mandates of the Court, by sequestering his property. Here, however, the party was not in contempt, and there was no pretext for the seizure of the slaves, but upon the supposition that the complainant had title to them or an equitable lien on them for his purchase money. In such a case, Chancery

could, doubtless, on a proper shewing, interpose, and by its process, prevent the property from being carried beyond the jurisdiction of the Court, before its action could be had upon it.

In this case, however, the claim was purely legal in its character, and no reason is shown why an attachment at law would not have been effectual.. We are therefore of opinion, that the bill was correctly dismissed as to Wallace, as well as the rest of the defendants.

At the hearing, the Chancellor directed a reference to the Master to ascertain the value of the slaves, and who were the sureties to the forthcoming bonds; also the amount which the defendant was entitled to recover of the complainant and his sureties, in the event the slaves were not delivered according to the condition of the forthcoming bond.

At the next term of the Court, which was held by Chancellor Peck, the Master made his report, which the Chancellor set aside, on the ground that it contained no fact material to the disposition of the cause ; and decreed that certain slaves, naming them, be delivered to the defendants on demand ; and that, upon a failure to comply with the order, the bonds be declared forfeited ; and that the defendants have leave to proceed on the same at law.

This decree was again made, and entered in the same words by Chancellor Bowie, at the succeeding term. It is not necessary now to inquire into the reference to the Master, as his report was set aside. It was certainly not error in the Chancellor to declare the forthcoming bonds forfeited upon a breach of the condition, as that was merely the legal result of the fact upon the dismissal of the bill ; nor was there error in permitting the defendants to sue at law for a breach of the condition of the bonds.

Indeed, it would seem, that there could be but little doubt . that, as the slaves were taken from the possession of the defendants by the *fiat* of the Chancellor at the prayer of the complainant in this suit, the Court have compelled the restoration of the slaves, or their value and the value of their hire, without turning the injured party round to seek redress in another Court. Thus we have held that, where the Court directs a sale of land, it may put the purchaser in possession, and will not drive him

40

*Caraway v. Wallace et als.*

to an action of ejectment.   But if this is an error, it is one of which the plaintiff in error cannot complain.

It has been previously held by this Court, that the Court held by Chancellor Peck, when the order made by him in this cause was made, was not a term recognized by law ; and that a decree then made would be reversed on error for that cause.   But if the decree made by him in this cause, be conceded to be a nullity, it would not avail the plaintiff in error ; as the same decree was made by Chancellor Bowie at a regular term, which will operate *proprio vigore,* and without reference to the former decree.

Finally :  It was insisted that there was no proof in the record of the deed of trust, on which the defendants claim title to the slaves.   The deed which we find recited in the answer, is sent up with the record, and as part of it ; and appears to have been proved before a Notary Public.   The proof of an instrument like this cannot be made before a Notary, so as to dispense with the proof of its execution, and entitle it to be read in evidence in a Court of justice, without further proof; but we think its existence is alledged in the bill in such a manner as to dispense with the proof of its execution.   It is alledged in the bill, that the defendants claim by virtue of a deed of trust made by Wallace to Campbell as trustee ; and that the trustee, by virtue of the conveyance, has taken possession of the slaves.   In the answers of both Sayre & Converse and the trustee, the deed is set forth and relied on, and is found in the record.   It was obviously acted on in the Court below, and, so far as we can judge without objection on this score.   To permit the plaintiff now to insist that the deed has not been proved, would be a surprise on the defendants, as the fact of its execution was not attempted to be put in issue.

The debt due from Wallace to Sayre & Converse, is fully proved by the deposition of Pritchard.

It results from this examination, that there is no error in the decree of the Court below; and it is therefore affirmed, with costs.