## N. Y. SUPERIOR COURT.

CHARLES P. CURRIE and others, appellants agt. CUMBERLAND
G. WHITE, respondent.

The plaintiffs and the defendant being *stockbrokers* in the city of New York, on the
18th day of February, 1867, entered into an agreement for the sale and purchase
of stocks, as follows:

"NEW YORK, 18th Feb'y, 1867.

(1000 shares.) We have purchased of C. G. White, one thousand (1000) shares of
the capital stock of the Hudson R. R., at one hundred and twenty-eight
per cent, payable and deliverable seller's option, in this year (1867) with interest
at the rate of six per cent per annum; either party having the right to call from
time to time, for deposits, to meet the fluctuations of the market" (Signed) Cur-
rie, Martin, & Co.

A counter-part of this agreement, for the sale to Currie, Martin & Co., of 1000
shares of said stock, was signed by C. G. White.

*Held,* that this is an *executory contract.* The obligation of the vendor to deliver, and
that of the buyers to pay, are concurrent conditions in the nature of mutual condi-
tions precedent, and neither party can enforce the contract against the other with-
out showing performance, or offer to perform his own promise according to the
conditions of the contract; and as the vendor had the option to deliver at any time,
according to his pleasure, between the day of the contract and the 31st day of
December, 1867, and the buyers could not be called upon to pay before delivery,
it *cannot be considered as an executed contract of sale.*

Consequently, any *cash dividends* declared upon said shares of stock during such
period, or any *additional shares* of stock which may be issued by the company
during such period. which may enure to the benefit of the stockholders of the
company, either by dividends or otherwise, upon such additional shares, or any
difference in the price of the shares of such original stock, between the *contract
price and their market value,* during such period, all enure entirely to the benefit
of the *owner* of the stock—the seller named in the contract, and not to the pur-
chasers therein—the contract remaining executory.

*General Term, March,* 1869.

APPEAL from judgment at special term.

This action, upon the issues of fact joined therein, was
tried before the Hon. SAMUEL JONES, justice, at special term,
without a jury.

The nature of the action, and the facts, will fully appear
from the findings of fact and conclusions of law of said jus-
tice, which are as follows:

I. That the plaintiffs are copartners under the firm name of Currie, Martin & Co., and the plaintiffs and the defendant were, at the times hereinafter mentioned, stockbrokers.

II. On the eighteenth day of February,1867, the plaintiffs and the defendant entered into an agreement with each other, and executed as evidence thereof, the following written instruments.

### EXHIBIT A.

(1000 shares.) New York, 18th Feb'y, 1867.

We have purchased, of C. G.White, one thousand (1000) shares of the capital stock of the Hudson River R. R., at one hundred and twenty-eight per cent., payable and deliverable sellers option, in this year (1867), *with interest* at the rate of six per cent. per annum ; either party having the right to call, from time to time, for deposits, to meet the fluctuations of the market."

[10 cent stamp.] CURRIE, MARTIN & CO.

### EXHIBIT B.

(1000 shares.) New York, Feb'y 18, 1867.

I have sold to Currie, Martin & Co., one thousand shares of the capital stock of the Hudson River railroad company, at one hundred and twenty-eight per cent., payable and deliverable seller's option in this year, with interest at the rate of six per cent. per annum; either party having the right to call, from time to time, for deposits, to meet the fluctuations of the market. C. G. WHITE.

[10 cent stamp.]

III. Under the said agreement, the plaintiffs made six deposits as security for the performance thereof, in the United States Trust company, as follows :

On the 23d February, 1867, the sum of $10,000
" 13th May, " " 10,000
" 20th May, " " 5,000
" 8th June, " " 10,000
" 19th July, " " 10,000
" 22d July, " " 10,000

and called upon the defendant to make six like deposits, which he did.

The Trust company gave to the plaintiffs, for each deposit made by them, a certificate in the following form:

EXHIBIT C.

United States Trust Company of New York, }
($10,000)                    23d February, 1867. }

This is to certify, that Currie, Martin & Co., have deposited with this company ten thousand dollars, payable in current funds on five days notice, to them and C. G. White jointly, upon the surrender of this certificate (which is assignable only upon the books of the company), with interest commencing after ten days from date, at the rate of four per cent. per annum. No interest to be allowed unless the same amounts to at least fifty cents.

JOHN A. STEWART, *President.*
W. DARROW, Jr., *Secretary.*

These certificates were all alike, except as to dates and amounts, which were made to correspond with the deposit for which the particular certificate was given.

The Trust company also gave to the defendant, for each deposit made by him, a certificate in the following form:

EXHIBIT D.

United States Trust Company of New York, }
($10,000.)                    February, 23, 1867. }

This is to certify that C. G. White has deposited with this company ten thousand dollars, payable in current funds on five days' notice, to him and Currie, Martin & Co. jointly, upon the surrender of this certificate (which is assignable only upon the books of the company), with interest, commencing after ten days from date, at the rate of four per cent. per annum. No interest to be allowed unless the same amounts to at leat fifty cents.

JOHN A. STEWART, *President.*
W. DARROW, Jr., *Secretary.*

These certificates were all alike, except as to dates and amounts, which were made to correspond with the deposit for which the particular certificate was given.

To so much of this finding as found, that the deposits therein mentioned were made as security for the performance of the contract between plaintiffs and defendant, the plaintiffs afterwards, by exception duly filed, excepted, on the ground that such alleged fact was not proven.

IV. On the 15th day of April, 1867, the Hudson River railroad company declared a cash dividend of four dollars per share upon the capital stock of said company, as it stood on the 18th day of February, 1867, and on the 15th day of October, 1867, declared another cash dividend of four dollars per share upon the same amount of capital stock.

The plaintiffs, on the trial, requested the court to find :

That the cash dividend last-mentioned was also declared on that portion of the additional stock which was issued on the 15th of April, 1867.

The court refused so to find, on the ground that such alleged fact was immaterial, to which the plaintiffs duly excepted, on the ground that the matter of fact, embraced in the finding so proposed to said court, was proven on said trial by unimpeached and uncontradicted evidence.

The said court further found :

V. The said dividends were paid to the holders of said stock, on said 18th day of February, and on the 15th day of October, 1867, respectively.

The plaintiffs, on the trial, requested the court to find :

That the cash dividends, on that portion of the additional stock which was issued at $54 per share, was paid to the holders of said stock, on the 15th day of October, 1867.

The court refused so to find, on the ground that such alleged fact was immaterial; to which the plaintiffs duly excepted, on the ground that the matter of fact, embraced

in the finding so proposed to said court, was proven on said trial by unimpeached and uncontradicted evidence.

The said court further found :

VI. On the first day of April, 1867, the board of directors of the said The Hudson River railroad company passed the following preamble and resolutions :

### EXHIBIT E.

Office of The Hudson River Railroad Co.,
270 West 30th Street,
New York, April 1, 1867.

*To the Stockholders of the Hudson River Railroad Co.* :

Take notice, that the board of directors of this company, at their meeting, held this day, passed the following preamble and resolutions :

*Whereas,* the stockholders of the company at a meeting of such stockholders, called by the directors of the company, in the manner required by law, and held at the office of the company, on the 30th day of March last, did with the concurrence of more than two-thirds in amount of all its stockholders, authorize and sanction the increase of the capital stock of the company, to the amount of thirteen millions nine hundred and thirty-seven thousand and four hundred dollars ; therefore,

*Resolved,* That the capital stock of the company be, and the same, is hereby increased to the amount of thirteen millions nine hundred and thirty-seven thousand and four hundred dollars.

*Resolved,* That the stock transfer books of this company, be closed on the tenth day of April, instant, and that the persons or parties in whose names stock shall be standing on that day shall severally, on or before the 15th day of April, instant, be entitled to subscribe at the office of the company, No. 270 West thirtieth street, in the city of New York, for an equal amount of additional stock ; that the price of the additional stock shall be fifty dollars per share, payable as follows:

Fifteen dollars per share at the time of subscribing.

Five dollars per share on the 15th day of May next.

Five dollars per share on the 15th day of June next.

Five dollars per share on the 15th day of July next.

Five dollars per share on the 15th day of August next.

Five dollars per share on the 16th day of September next.

Ten dollars per share on the 15th day of October next.

That on the 15th day of October next, all instalments being paid, full paid stock shall be issued.

*Resolved*, that where parties desire, for their own convenience, to anticipate payments, their money for any number instalments will be received, but no interest will in any case be allowed; nor will the stock be issued until the 15th day of October next.

*Resolved*, That stockholders failing to subscribe on or before the 15th day of April, instant, or neglecting to pay their several instalments as they severally become due, will lose all right to the additional stock, and will be deemed to have abandoned their subscriptions.

*Resolved*, That the subscriptions may be made to the additional stock, either in person or by attorney. A scrip receipt will be given for the payments made, and this receipt must be presented at this office on the payment of any of the subsequent instalments, in order to have them entered upon it, and be surrendered to be canceled on the issue of the additional stock.

*Resolved*, That where parties desire to receive full stock on the 15th day of April, instant, they may do so by paying fifty-four dollars per share at the time of making their subscriptions.

By order of the board. C. C. CKARKE, *Treasurer*.

The books of the company were opened for subscriptions to the additional stock, under regulations established by the above resolutions of the board of directors.

The plaintiffs, on the trial, made separate requests to the court to find the following facts, respectively.

1. That in the month of April, 1867, the said Hudson River railroad company increased their capital stock by doubling it.

2. That before said increase, the said capital stock was $6,968,700, and, by such increase, became $13,937,400.

3. That there was a meeting of the stockholders of the said company held for the purpose of increasing the capital stock, as aforesaid, on the 30th day of March, 1867, on the day advertised in the notice thereof, which was given on the 5th of March, 1867.

4. That, at said meeting, there was duly represented a very large majority of the stock.

5. That the notice above mentioned, exhibit " E," was published at its date, and came to the knowledge of the defendant.

6. That the stockholders subscribed, in the books of the company, for the whole of the additional stock; that a part of them, as prescribed in said exhibit " E," subscribed at the rate of $54 a share, and a part of them at the rate of $50 a share.

7. That the books of subscription, to such increased stock, were opened from 10th of April, 1867, to 24th October, 1867.

8. That the bulk of the stockholders subscribed before the 15th of April, 1867, and that the last subscriptions were made on the 24th October, 1867.

9. That the new stock was duly issued under these subscriptions, and according to the terms of the notice, exhibit "E."

10. That the persons who so subscribed, were persons who were stockholders on the books of the company on the 10th April, 1867, or their legal representatives, and no others.

11. That each of them received of the new stock the same number of shares that he then held of the old stock.

As to each and every of the foregoing eleven requests, the court refused, separately, to find in accordance there-

with, on the ground that such alleged facts were each of them immaterial, and the first three unproved.

And, to each of such separate refusals, the plaintiffs duly and separately excepted, on the ground that the matter of fact embraced in the finding, so proposed to said court, was proven on said trial by unimpeached and uncontradicted evidence.

The said court further found:

VII. On the 8th day of April, 1867, the plaintiffs sent to the defendant a notice, of which the following is a copy:

EXHIBIT F.

New York, April 8, 1867.

C. G. WHITE, Esq.:

*Dear Sir*—On the 18th February last, we purchased from you one thousand shares of Hudson River railroad company stock, at one hundred and twenty-eight per cent., seller's option, this year.

You will please take notice, that we elect to subscribe for the additional stock as provided in the resolutions of the company, at their meeting on the 1st April, instant, and that we look to you for the same. Very respectfully,

CURRIE, MARTIN & CO.

VIII. But the said notice was not received, by the defendant, until between four and five o'clock in the afternoon of the 10th day of April, 1867.

IX. That if there was any tender or offer to perform the contract, on their part, made by the plaintiffs to the defendant, said tender or offer was made either on the 19th day of December, 1867, or on the 31st day of December, 1867, and at no other time or times.

X. That there was no tender or offer to perform the contract, on his part, made by the defendant to the plaintiffs. That the defendant did not, either on the 19th or the 31st day of December, 1867, or at any time, deliver to the plaintiffs either the one thousand shares mentioned in the aforesaid contract, or one thousand alleged additional shares,

or any part thereof; nor did the defendant pay to plaintiffs, either on the 19th or 31st day of December, 1867, any dividend which had been declared by the Hudson River Railroad Company, or any part thereof.

XI. That at the time of the entering into the contract aforesaid, the plaintiffs did not pay the purchase-money mentioned in said contract, or any part thereof; nor have they, at any time since entering into the contract aforesaid, paid the purchase-money therein mentioned, or any part thereof, to the defendant.

To this finding, and the whole thereof, plaintiffs afterwards, by exceptions duly filed, excepted, on the ground that the deposits mentioned in the third finding were payments of portions of the purchase-money

The plaintiffs, on the trial, made separate requests to the court to find the following facts, respectively:

1. That on the 19th day of December, 1867, the plaintiffs offered to accept from the defendant the one thousand shares of Hudson River Railroad stock, in said contract mentioned.

2. And also offered to pay for the same, to the defendant, the sum stated in said bill, Exhibit "H," $134,421.33, and duly tendered such payment.

3. That the defendant refused to accept such offer, or tender.

4. That the said defendant also refused to deliver the said shares.

5. That, at the same time, the plaintiffs demanded of the defendant the dividends on the one thousand shares above mentioned.

6. That, at the same time, the plaintiffs demanded of the defendant the delivery to them of a second one thousand shares of said stock, the portion of the new issue of stock by the said company, on their increase of capital in April, 1867, accruing to the owner and the holder of the one thousand shares above mentioned, with the cash dividends

made thereon; and that the plaintiffs then offered to pay the defendant the price at which the said stock was issued, with interest $56,232, and duly tendered such payment.

7. That the defendant refused to accept such tender.

8. That the defendant refused to deliver said second 1,000 shares.

9. That the defendant refused to pay or account for the said dividends, or either of them.

10. That on the 18th day of December, 1867, the defendant sent to the plaintiffs a notice, of which the following is a copy:

EXHIBIT G.

New York, Dec. 18, 1867.

Messrs. CURRIE, MARTIN & Co.:

I will deliver you, to-morrow, 1000 shares Hudson R. R. stock on my contract, Feb. 18, seller this year, at $128 per share. Respectfully, C. G. WHITE.

11. That on the 19th December, 1867, the defendant pursuant to his notice, went to the plaintiffs' office, having with him 1,000 shares of said stock, and a bill properly stamped, of which the following is a copy:

EXHIBIT H.

CURRIE, MARTIN & Co., To C. G. WHITE,

February 18, 1,000 Hudson, $128,........$128,000.00

10 mo. and 1 day int., 6 p. c.....6,421.33

U. S. Stamp. $13.44.

Certified check. $134,421.33

12. That the said defendant saw Mr. Martin, one of the plaintiffs, standing behind the counter. He handed Mr. Martin the bill, the copy of which is given above, Mr. Martin asked him if he would not take off the cash dividends; he replied that he would if Mr. Martin would indorse his certificates in the Trust Company.

13. That Mr. Martin, one of the plaintiffs, then handed to the defendant two papers, copies of which are as follows:

### EXHIBIT  I.
New York, Dec. 19, 1867.

Mr. C. G. WHITE:

We will accept the 1,000 shares Hudson R. R. stock, you propose to deliver us to-day, and pay you therefor the sum stated in your account, $134,421.33, and we demand of you the cash dividends thereon, and interest.   Respectfully.

CURRIE, MARTIN & CO.

### EXHIBIT  K.
New York, Dec. 19, 1867.

Mr. C. G. WHITE:

We require you to deliver to us, under your contract, dated 18th February, 1867, a second 1,000 shares of Hudson R. R. stock, the portion of the new issue of stock by said company, on their increase of capital in April, 1867, accruing to the owner and holder of the 1,000 shares mentioned in your said contract.   We tender to you the price at which said new stock was issued, with interest, $56,232, and demand and claim from you the delivery of said second 1,000 shares and the cash dividends, if any, that have been made thereon.      Yours, CURRIE, MARTIN & CO.

14. That the defendant then stepped to the window, read the two papers, and remarked to Mr. Martin that he did not know the effect of the two papers, but would consult his attorney and return.   He then left, taking with him the stock.

15. That the defendant did not return.

16. That the defendant did not, at that interview, produce or exhibit the certificates, nor tell the plaintiffs that he had them.

17. That Mr. Martin, one of the plaintiffs, at the last-mentioned interview, drew the plaintiffs' check for $134,421.33.

18. And also, that said Martin, at the same time, drew the plaintiffs' check for $56,232.

19. That the said checks were ready to be delivered to the defendant before he so left plaintiffs' office.

20. That the plaintiffs handed these checks, as soon as they were drawn, to their clerk to go and get them certified.

21. That the president of the bank, on which such checks were drawn, had previously agreed to certify them.

22. That the plaintiffs had not drawn the checks, before defendant came to their office, on the said 19th day of December, because they did not know precisely how much defendant wanted them to pay, or whether defendant would deduct the cash dividends.

23. That it was the usage and custom of said business, in delivering stock, for the purchaser to receive the bill, and draw the check immediately, send it to the bank and get it certified, and for the seller to wait to receive it.

24. That the defendant did not ask for the checks, or either of them.

25. That the checks were not tendered at the time to defendant, merely because defendant went away, saying he would return. And that he did not return.

26. That on the 31st day of December, 1867, the plaintiffs offered to accept from the defendant the 1,000 shares of Hudson River railroad stock in said contract mentioned.

27. And also offered to pay for the same to the defendant the sum stated in said bill, Exhibit H, $134,421.33, and duly tendered such payment.

28. That the defendant refused to accept such offer or tender.

29. That the said defendant also refused to deliver the said shares.

30. That, at the same time, the plaintiffs demanded of the defendant the dividends on the 1,000 shares above mentioned. That, at the time, the plaintiffs demanded of the defendant the delivery to them of a second 1,000 shares of said stock, the portion of the new issue of stock by the said company, on their increase of capital in April, 1867, accruing to the owner and holder of the 1,000 shares, first above mentioned, with the cash dividends made thereon; and that the plain-

tiffs then offered to pay to the defendant the price at which the said stocks were issued, with interest, $56,232, and duly tendered such payment.

31. That the defendant refused to accept such tender.

32. That the defendant refused to deliver said second 1,000 shares.

33. That the defendant refused to pay or account for the said dividends, or either of them.

34. That on 31st December, 1867, at about half-past one o'clock, the plaintiffs sent by their messenger to defendant, a letter as follows:

EXHIBIT L.

Mr. C. G. WHITE:

*Sir*—Our checks for $134,421.33 and $56,232 have been ready for you since they were tendered you, with our two notices relative to our Hudson River contract, on the 19th inst.; you then said you were not ready to give an answer, but would see about it.

We are ready to do what we offered and tendered in our notices, and renew our notices, but suppose your silence is equivalent to your refusal to comply with them.

Yours, &c., CURRIE, MARTIN & CO.

N. Y., December 31, 1867.

And two checks, one for $134,421.33, the other for $56,232.

35. That these checks were the same that were drawn on the said 19th December.

36. That the plaintiffs had since kept the said checks in their possession.

37. That when the plaintiffs' messenger went to the defendant's office, on the 31st December, he tendered him these two checks with the letter (exhibit L.)

38. That said messenger handed the letter to the defendant and said: "here are the checks."

39. That the defendant took and looked at the checks.

40. That said defendant then said in reply, "I will see," and paid no further attention to the matter.

Currie agt. White.

41. That the said messenger then observed to the defendant, that he would get the checks certified if he required it.

As to each and every of the foregoing forty-one requests, the court refused separately to find in accordance therewith, on the ground that such alleged facts were, each of them, immaterial; and on the ground that no tender by plaintiffs was proved; and, on the further ground that there was no offer to take and pay for the one thousand shares, distinct and independant of a demand for another one thousand shares; and for two dividends on two thousand shares; and the further ground that the requests from 10th to the 25th, both inclusive, and from the 24th to the 31st, both inclusive, are requests to find to matters of evidence only.

And, to each of such separate refusals, the plaintiffs duly and separately excepted, on the ground that the matter of fact embraced in the finding, so proposed to said court, was proven on said trial by unimpeached and uncontradicted evidence; and, on the further ground, that the objection that there was no offer to take and pay for the one thousand shares, distinct and independent of a demand for another thousand shares, and for two dividends on two thousand shares, was not taken or stated by the defendant at the trial; nor in any way brought to the plaintiffs' notice before the decision in this action.

The said court further found:

XII. That on the said 19th day of December, 1867, the market value of the capital stock of the said Hudson River Railroad Company was $132⅞ per share. On the 31st day of December, 1867, the market value thereof was $131⅝ per share; and on the 8th day of February, 1868, after which day the trial of this action was had, the market value thereof was $149 per share.

The said court found the following

CONCLUSIONS OF LAW.

1. That the plaintiffs are not entitled to recover from the

defendant the said dividends declared on the said one thousand shares of stock mentioned in the contract.

To this finding and the whole thereof, plaintiffs afterwards, by exceptions duly filed, excepted.

II. That the plaintiffs are not entitled to recover from the defendant the difference between the market value of one thousand of the alleged additional shares, on the 8th day of February, 1868, and the sum required by the said The Hudson River Railroad Company, to be paid for such alleged additional shares.

To this finding, and the whole thereof, plaintiffs afterwards, by exceptions duly filed, excepted.

III. That the plaintiffs are not entitled to recover the difference between the market value of the one thousand shares, mentioned in the said contract, on the 8th day of February, 1868, and the contract price, to wit, one hundred and twenty-eight dollars, per share.

To this finding, and the whole thereof, plaintiffs afterwards, by exceptions duly filed, excepted.

IV. That the defendant is not entitled to recover from the plaintiffs the difference between the contract price of the one thousand shares, mentioned in the contract, and the market value of said shares on the 19th day of December, 1867.

V. That the defendant is entitled to judgment, dismissing the plaintiffs' complaint, and directing the plaintiffs to duly indorse the said six certificates of deposit issued to the defendant by the said The United States Trust Company; and further directing the defendant to indorse the six certificates issued to the plaintiffs by the said The United States Trust Company, so that the plaintiffs and the defendant may draw out the said deposits by them respectively made with said Trust Company as aforesaid, with the interest that has accrued or may accrue thereon, before such withdrawal.

VI. That the defendant recover nothing from the plaintiffs on his counter-claim.

Currie agt. White.

VII. That neither party have the costs of the action as against the other.

The plaintiffs, on the trial, separately requested the court to find each of the following conclusions of law:

*First.* That the plaintiffs are entitled to judgment against the defendant, for the market value of the first mentioned one thousand shares, after deducting $128 per share, the contract price, with the interest thereon from the date of contract, at the rate of six per cent. per annum.

The court refused so to find, to which the plaintiffs duly excepted.

*Second.* That the plaintiffs are entitled to judgment against the defendant, for $8,000 dividends on said one thousand shares.

The court refused so to find, to which the plaintiffs duly excepted.

*Third.* That the plaintiffs are entitled to judgment against the defendant for the value of one thousand shares, being of such new issue, at their market value, less the price at which the same was so issued.

The court refused so to find, to which the plaintiffs duly excepted.

*Fourth.* That the plaintiffs are entitled to judgment against the defendant, for $4,000 the dividend made and paid on said second one thousand shares, being of such new issue.

The court refused so to find, to which the plaintiffs duly excepted.

The following opinion was rendered by the same justice:

JONES, J.—(After reciting the facts and setting forth exhibits A. to L. inclusive.) The plaintiffs claim:

1st. The dividends declared on the 1,000 shares and interest. 2d. The difference between the value of 1,000 of the alleged additional shares on February 8, 1868, and the sum required by the company to be paid therefor, and interest. 3d. The difference between the value of the 1,000

shares (mentioned in the contract) on the 8th of February, 1868, and the contract price and interest.

The defendant contests all these claims, and himself claims the difference between the contract price of the 1,000 shares mentioned in the contract, and their marketable value on December 19, 1867, with interest thereon.

As to the plaintiffs claims :

The first two evidently depend on whether the contract was executed or executory ; that is, whether it operated as an actual and present sale, or only as an agreement to sell, to be carried into effect on a future day.

Dividends declared and additional shares issued, when declared and issued, become the property of those who own the stock in respect whereof they are declared and issued at the time of said issue and declaration. They are not incorporated in, nor do they become a part of that stock in respect whereof they are issued, but are mere profits arising therefrom to the then owners thereof.

One, by making a contract whereby he agrees to sell, a year after its date, property real or personal, does not thereby deprive himself of any profit, which may have accrued therefrom, or advantage which may arise from its possession or use during that year; nor do such profits or advantages pass to the purchaser in the absence of an express contract that they shall pass.

If, then, the contract in question is executory, and remained unexecuted until after the dividends were declared and the additional stock was issued, the plaintiffs are not entitled to them.

It is often a matter of great difficulty to determine whether a contract is executed or executory; but, in this case, whatever doubts I may have had are set at rest by the case of *Kelly* agt. *Upton*, decided by the general term of this court (5 *Duer.*, 336), which is a direct authority in point, and according to which the contract in question is executory.

Nothing was attempted to be done to execute it until December 19, 1867, long after the dividends were declared and the additional stock issued.

It results that the first two claims of plaintiffs must be disallowed.

The third claim is founded on an erroneous application of the rule relative to the measure of damages.

This defendant, if liable at all, is so for the simple breach of a contract to deliver certain stock, the vendee not having paid to him the purchase money in advance. In such case the measure of damage is the difference between the contract price of the articles agreed to be sold and their market price on the day of breach.

This difference the plaintiffs would be entitled to recover. It therefore becomes necessary to ascertain whether the defendant broke his contract. If so, when, and the market value of the stock on the day of the breach.

If there has been any breach by defendant it occurred either on the 19th or 31st of December, 1867. As the market value of the stock on one of those days was less than the contract price, plaintiffs, even if there was a breach by defendant, suffered no actual damage. It is therefore unecessary in this view to consider whether there was such breach.

As to the defendant's claim. This rests on the defendant's allegation that there was a breach of the contract on the plaintiffs' part on the 19th of December. To establish such breach, he insists that he, on that day, tendered, and was ready and offered to deliver the stock, but plaintiffs neglected to receive it and pay for it. Assuming that his handing up exhibit 11, the stock being in his possession, was a sufficient tender, and a sufficient indication to plaintiffs of his readiness and ability then and there to fulfil his contract, yet the effect of it was done away by his subsequent acts at the same interviews; for, after plaintiffs handed him exhibits I and K, he clearly withdrew his previous tender,

and declared himself not ready then to fulfil his contract, by saying that he desired time to consult his lawyer, and would return shortly, and thereupon departed with the stock in his possession.

The result arrived at is, that neither party has a claim against the other for damages arising out of a breach of the contract in question, and that each party is entitled to a return of the deposit made by him, with the interest thereon.

The case is one in which each party should pay his own costs.

Judgment was, on the 24th day of October, 1868, entered in conformity with the findings and opinion of said justice, and from so much of the judgment as directs the plaintiffs to indorse the six certificates of deposit issued to the defendant, and to do other things in respect thereto, and as adjudges that the plaintiffs recover nothing from the defendant, the plaintiffs appeal to the general term.

WILLIAM R. MARTIN, *plaintiffs' attorney.*

BARRETT & BRINSMADE, *defendant's attorneys.*

*By the court,* FREEDMAN, J. The plaintiffs claim that they are entitled to recover against the defendant :

I. The $8,000 cash dividends declared upon the first 1,000 shares mentioned and referred to in the contract of February 18, 1867, with interest.

II. The value of 1,000 additional shares of an alleged later issue, at the price of 149, that being the alleged market value of the same on February 8, 1868, less the price of 54, at which they were issued by the company, with interest, &c.

III. A cash dividend of $4,000, claimed to have been made upon the 1,000 additional shares of the later issue; and,

IV. The value of the first 1,000 shares of Hudson River Railroad stock, mentioned in the contract of February 18, 1867, at the price of 149, that being the alleged market-

value of the same on the 8th day of February, 1868, after deducting therefrom the contract price of 128, with interest at the rate of six per cent. added thereto, from the date of the contract.

Upon a mere inspection of the contract, it does not appear whether the defendant had or had not at the time the possession of the 1,000 shares therein referred to ; and the first question which presents itself is as to the effect of the said contract. Does it constitute an actual bargain and sale, whereby the 1,000 shares, the subject of the said contract, became the property of the plaintiffs the moment the contract was concluded, and without regard to the fact that the defendant had the option to deliver the shares at any time during the year he saw fit ; or, is it a mere executory agreement, an agreement to sell, to be carried into effect at some time during the course of that year according to the pleasure of the defendant ?

There is no doubt—to use the language of Judge Comstock in *Decker* agt. *Furniss* (4 *Kern.*, 612)—that the phrases "we have purchased" and " I have sold" standing at the head of the contract import an executed sale, but such phrases are quite inconclusive and are often made to yield to other terms of the contract evincing a different design, and they are qualified in this case by the words : " payable and deliverable, sellers' option, in this year (1867), with interest at the rate of six per cent. per annum ; either party having the right to call, from time to time, for deposits to meet the fluctuations of the market."

The defendants' engagement to deliver was not unconditional, but dependent upon the exercise of his option ; he had a right to perform that part of the contract at any time between the date thereof and the 31st day of December, 1867 ; he was in no way chargeable for the non-delivery until after the expiration of the last-named day, and a tender on the part of the plaintiffs after that day ; and before the exercise of the option by the defendant, neither of the par-

ties could be in default before said 31st day of December, 1867, (*Russell* agt. *Nicoll,* 3 *Wend.,* 112; *Outwater* agt. *Dodge,* 7 *Cow.,* 85; *Ward* agt. *Shaw,* 7 *Wend.,* 405; *McDonald* agt. *Hewitt,* 15 *Johns. R.,* 349).

The obligation of the vendor in this case to deliver, and that of the buyers to pay, are concurrent conditions in the nature of mutual conditions precedent, and neither party can enforce the contract against the other without showing performance, or offer to perform his own promise according to the conditions of the contract; and, as the vendor had the option to deliver at any time, according to his pleasure, between the day of the contract and the 31st day of December, 1867, and the buyers could not be called upon to pay before delivery, it cannot be considered as an executed contract of sale.

It is true, that in some cases, notwithstanding the postponement of payment and delivery, it has been held that the right of property became vested in the vendee, while the right of possession continued in the vendor until the payment of the purchase money; but these cases have reference only to the sale of specific personal property, and if the plaintiffs intend to claim title to the 1,000 shares upon the principles decided by these cases, they should have have shown either that the identical 1,000 shares were, at the time of the execution of the contract, in the possession of the defendant, or some other specified place; that they were defined and designated so as to be capable of being identified and distinguished from other shares of the same company, and that the contract referred to this particular lot.

It does not appear from the contract that reference was had or made to any specific or particular lot of shares, nor does the evidence show that such was the intention of the parties, and therefore the general rule applies, that if goods be sold while mingled with others, by number or otherwise, the sale is incomplete, and the title continues with the seller

until the bargained property be separated or identified (2 *Kent, Com.,* 496). The reason is, in such case, that the sale cannot be applied to any article until it is clearly designated, and its identity thus ascertained. Thus if an entire flock of sheep is sold at so much the head, and it is agreed that they shall be counted after the sale in order to determine the entire price of the whole, the sale is valid and complete. But if a given number out of the whole are sold, no title is acquired by the purchaser until they are separated, and their identity thus ascertained and determined. The distinction in all these cases does not depend so much upon what is to be done, as upon the object which is to be effected by it. If that object is specification, the property is not changed—but if it is merely to ascertain the total value at designated rates, the change of title is effected. Thus where there is a bargain for a certain quanity, ex. a greater quantity, and there is a power of selection in the vendor to deliver which he thinks fit, then the right to the property does not pass to the vendee, until the vendor has made his selection, and trover is not maintainable until that is done. If I agree to deliver a certain quantity of oil, as 10 out of 18 tons, no one can say which part of the whole quantity I have agreed to deliver until a selection is made. There is no individuality until it has been divided (*Gillett* agt. *Hill,* 2 *C. & M.,* 530).

The case of *Kimberly* agt. *Patchin,* (19 *N. Y.,* 330), does not establish a contrary doctrine, as claimed by plaintiffs, but on examination it will be seen that it is in perfect harmony with the general rule referred to by me. In this case parties clearly expressed their intention that the title should pass. The owner of the wheat, lying in mass in his warehouse, sold 6,000 bushels thereof for a specified price, executed to the vendee a receipt, acknowledging himself to hold the wheat subject to the purchaser's order, received drafts on account of the purchase money, and fully arranged for the payment of the balance, and otherwise fully completed

the sale, so far as necessary. Under these circumstances the court held, among other things, that where the quantity and general mass, from which it is to be taken, are specified, the subject of the contract is thus ascertained, and it becomes a *possible* result for the title to pass, *if the sale is complete in all its other circumstances &c.* And the title may also pass, where goods are delivered by the vendor to the purchaser, although no fixed price is agreed upon. Thus, in *Joyce* agt. *Swann,* (17 *Com. B. N. S.,* 84, 1864), cited by plaintiffs, the question was whether or not one McCaster had an insurable interest in a certain quantity of guano, at the time of effecting the policy, and the judge charged the jury to the effect that, if the guano was put on board the vessel by the vendors, with the intention of passing the property to McCaster, they must find for the plaintiff; and that it was not a necessary condition to the passing of the property, that the price should be definitely agreed on. The jury rendered a verdict for the plaintiff.

WILLIAMS, J., who delivered one of the opinions *in banco,* approves the verdict on all the facts in the case, and says, that—"where, from all the facts in the case, it may fairly be inferred, that it was the intention of the seller to pass the property in the goods shipped to order, the mere fact of the bill of lading being taken in the name of the seller, will not prevent its passing; but if the bill of lading was retained to hold dominion over the goods, that then there was no intention to pass the property; but if the whole of the circumstances lead to the conclusion that that was not the object, the form of the bill of lading has no influence on the result. In this case the bill of lading was in the name of the seller."

Such cases, however, are exceptions to the general rule, and they merely decide that the title may pass where it is the clear and positive intention of both contracting parties that it shall pass. But the old rule which held that upon a sale of a *specific chattel,* notwithstanding the postponement

of *payment and delivery*, the right of property may in some cases become vested in the vendee, while the right of possession only continues in the vendor until the payment of the purchase money, has not only been modified in this state in all cases where payment and delivery are to be in futuro, and are to be simultaneous and concurrent acts (*Benedict* agt. *Field*, 16 *N. Y.*, 595–7; *Baker* agt. *Bourcicoult*, 1 *Daly*, 24; *Russell* agt. *Minor*, 22 *Wend.*, 664–671; *Chapman* agt. *Lathrop*, 6 *Cow.*, 110); but also in cases where the contract shows that there is no intention to pass the property, until something further is done by the seller. In such cases it has been held that the sale is not perfected and the property does not pass until the thing be done. (*Ward* agt. *Shaw*, 7 *Wend.*, 404; *Chapman* agt. *Kent*, 3 *Duer*, 232.)

In the case under consideration the defendant had until the 31st day of December, 1867, to exercise his option. The plaintiffs and the defendant are stockbrokers; they dealt with each other as such; it may be assumed that the plaintiffs were well acquainted with the rules and custom prevailing among brokers as to the sale of stocks, and with the fact that it was not necessary for the defendant under his contract to have the 1,000 shares of stock actually on hand. Formerly such a contract was a mere wager and illegal by statute, whenever the seller did not possess the stocks at the time (*R. S. Art.* 2., *tit.* 19, *ch.* 20, §§ 6, 7 *and* 8); but this statute was repealed by an Act entitled " An Act to legalize the sale of stocks on time " (4 *Edm. R. S.*, *p.* 110), and in this repealing statute is an express provision that thereafter no contract for the purchase, sale, &c., of stocks shall be void, because the vendor at the time of making the contract is not the owner of the shares. This statute therefore legalizes contracts for the sale of stocks on time, and which the vendor does not own. The plaintiffs undoubtedly were familiar with it, and it cannot therefore be said in the light of this statute, and the contract palpably drawn under it, and also in the light of the object of the contract, that

the defendant contracted for the delivery of a certain specific lot of 1,000 shares, or warranted the present possession by him of any such lot, on the 18th day of February, 1867.

For the purpose of carrying out his contract as made, it was not necessary for the defendant to be a stockholder on the books of the company at any time; it was sufficient if on the 31st day of December, 1867, he held a certificate representing 1,000 shares, with the necessary power of attorney to transfer the same, and if he held such certificate at any time prior to said date, he had a right to use it, and the number of shares represented thereby in his business, in any manner he saw fit, until that day. The rule, therefore, that a vendor impliedly warrants his title to what he assumes to sell, and consequently warrants the existence of what he assumes to sell, does not, since the passage of the statute referred to, necessarily apply any more to contracts for the sale of stocks on time, and for this reason it is unnecessary to notice or examine the numerous authorities cited by plaintiffs' counsel in support of the application of the rule referred to to the contract in this case. Under the said statute, a party may make a contract for the purchase of stocks on time with a person who neither owns the stock, nor has the possession or control of it; but if the purchaser fails to guard his own interests by express stipulations against the dilution of the stock by the company, by which it has been issued, it seems to me the contract may afterwards be satisfied by the delivery of stock as it exists on the day the contract is to be performed, and unless the purchaser insists in his contract upon all dividends, profits and advantages which may be declared upon or spring from the stock during the running of the contract, he should not, in my judgment, be afterwards permitted to make claim to them. A little prudence exercised at the proper time will enable him to secure all his contemplated rights in this respect.

Again, as the defendant was under no obligation to be a stockholder on the books of the company, nor to have a

certificate for 1,000 shares ready for delivery prior to the
31st day of December, 1867, how can it be said that it was
his duty on or about the 10th day of April, 1867, to sub-
scribe for 1,000 additional shares, which he could do in no
other way except by becoming a stockholder upon the books
of the company before that time, and to furnish the neces-
sary funds to the amount of upwards of fifty thousand
dollars to meet his subscription? Of what value would the
option, he expressly reserved to himself, be in such case?

All these circumstances tend to show that the contracting
parties at the time of the execution of the contract could
not have contemplated that the title to the shares should
pass.

It has been conceded by plaintiffs' counsel that the justice
who tried this cause was correct in holding, that dividends
declared and additional shares issued, when declared and issued,
become the property of those who own the stock, in respect
whereof they are declared and issued at the time of said issue
and declaration, and that they are not incorporated in, nor do
they become a part of that stock in respect whereof they are
issued, but are mere profits arising therefrom to the then
owners thereof. There can be no doubt of the correctness of
this proposition generally, although, strictly speaking, the pro-
fits do not arise from the stock, but are earned by the cor-
poration, and are distributed to such owners as are recognized
as such on the books of the company.

In *Spear* agt. *Hart*, (3 *Robertson*, 420) the dividend had
been declared before the sale, but was payable after the day
fixed for the delivery of the stock, and the court held, "that
the dividend belonged to the defendant and did not pass to
the plaintiff under the contract. Dividends are not an inci
dent to stock, so as to pass with the stock. Unlike interest,
they are not earned by the money represented in the stock,
but by the corporation; and are divided among the share
holders, and may be sold or assigned without parting with
the stock.

*Kelly* agt. *Upton*, (5 *Duer.*, 336), is a case presenting the same questions as the case now under consideration, with the difference, that in that case the option was on the part of the *buyer*. The court held that the contract was executory, that where the delivery of the thing sold, and the payment of the price are to be simultaneous acts, the title, until delivery or payment, remains in the seller.

The two cases last referred to seem fatal to the first three claims of · the plaintiffs'. They expressly decide that the contract in this case must be considered as an executory agreement, passing no title to the plaintiffs, however different their understanding of its effect may have been, and that the dividends and accretions as a general rule follow the title.

The plaintiffs, notwithstanding, however, claim that, although this may be so, the provision in the contract in this action that the purchasers should pay interest on the contract price from the date of the contract, is such a peculiar and controlling feature in the said contract in respect to its interpretation as to take it out of the operation of the general rule, that in consequence thereof it should be so interpreted as to hold the vendor liable to deliver the profits with the shares sold. The contract in *Kelly* agt. *Upton*, (5 *Duer.*, 336) contained the same feature. The learned counsel for the plaintiffs contended for the correctness of this theory so strenuously and persistently that in view of the importance of this case I made a complete and thorough examination and classification of the numerous authorities cited by the plaintiffs promiscuously upon this point. They establish the following principles:

I. In case of non-performance of a contract *at the time* fixed for the completion of the same, *without willful fault* on *either side*, the purchaser as a general rule is entitled to the profits of the estate from the time fixed upon for completing the contract, whether he does or does not take posssssion of the estate; and as from that time the money belongs to

Currie agt. White.

the vendor, the purchaser will be compelled to pay interest for it, if not paid at that day (2 *Sugd., V. & P.*, \*793; *Ackland* agt. *Gaisford*, 2 *Maddock*, 28, 1816; *Champernowne* agt. *Brooke*, 3 *Clark and Finnelly's appeal cases*, 4, 1835).

II. Where, however, interest is more in amount than the rents and profits, and it is clearly made out that the delay was occasioned by the vendor, although he may be free from personal misconduct, as for instance where the delay is caused by a defect in the vendor's title, which may be unknown to him, to give effect to the general rule would be to enable the vendor to profit by his own wrong, and the court therefore in such case gives the vendor no interest, but leaves him in possession of the interim rents and profits; and therefore, in such case, where a good title is not shown until a given period, the purchaser will pay interest only from that period, and he will, of course, take the rents from the same time (*Sugden on Vend. & P.*, \*806, §46).

III. Where the non-performance and delay has been occasioned by the willful default of the vendor, and the vendor has received interest, or has remained in possession, and in the meantime the property has diminished in value or has been deterioated by permissive waste, the purchaser is entitled to compensation, which may be decreed according to the circumstances of each case either by adjudging the vendor not entitled to interest on purchase money, but on the contrary accountable not only for the rents actually received but also for those which he might have received but for his willful default (*Sugden on Vend. & P.* \*807, §44; *Regents' Canal Co.* agt. *Ware*, 23 *Beavan*, 575, 1857, *Lord* ROMILLY).

IV. But where there is an express stipulation in the contract, that if the conveyance is not executed and the purchase money paid by the day named, interest shall be paid by the purchaser until the purchase is completed, the terms of that stipulation apply to every kind of delay, except such as may be occasioned by the *willful* default of the vendor.

In such cases the interest does not depend upon any rule of the court, but open the *express stipulation* of the parties, and the terms of that stipulation apply to every delay, however occasioned, except the *willful* default of the vendor or such other delay as may be expressly excepted from the operation of the contract; and whether in such cases the interest exceed the mesne profits or not, the purchaser *must* pay interest *according to his stipulation* (*Lord Palmerston agt. Turner*, 33 *Beavan*, 525,1864, Lord ROMILLY, *in which case the purchaser was held to pay interest at 4 per cent.*; *William agt. Glenton*, 34 *Beavan*, 528, 1865; *Tewart agt. Lawton*, 3 *Smale and Gifford*, 307, 1856, *V. C.* STEWART).

V. If, after the contract and before the conveyance, the estate, or a particular and specified fund, or a vested right or specific interest, be improved or increased, or if the value be lessened without any fault on either side, the vendee has the benefit and sustains the loss. (*Sugden on V.* *819 § 98; Anson agt. Towgood*, 1 *Jacob and Walker's Chancery R.*, 617, 1820; *Vesey agt. Elwood*, 3 *Drury & Warren*, 74, 1842; *Kimberley agt. Tew*, 5 *Irish Eq.*, 389, 1843; *Davy agt. Barber*, 2 *Atkins*, 490, 1742; *Small agt. Atwood*, 3 *Young & Collyer's Exch. R.*, 105, 1838).

The cases, so far examined, refer either to a specific estate in lands a specific interest in a particular fund, a specific vested right, or other specific property fully described and clearly identified, and, therefore, have no application to a contract for the sale of stocks generally, which may or may not be in the possession of the seller, which are not described so as to be capable of being distinguished and identified. The decision in each of said cases was made upon entirely different principles from those governing the sale of stocks on time. The profits and rents of an estate run with the land and come out of it; the interest and other accumulations attach to a specific fund and become part of the same. It is different, however, with stocks. Again it will be observed, that in every case so cited, there was either a default

on the part of the vendor in carrying out his contract, or, at any rate, the other party suffered delay in receiving what was coming to him; but notwithstanding this, the purchaser was invariably held to the terms of his contract, whenever he had stipulated to pay interest. In the case under consideration, the vendor did not make any such default.

VI. The next following additional cases cited by the plaintiffs simply decide that whenever a debtor is in *default* for not paying or repaying money, delivering property, or rendering services in pursuance of his contract, he is chargeable with interest from the time of *his default*, on the specified amount of money or the value of the property or services, at the time they should have been paid or repaid or rendered (*Van Rensselaer* agt. *Jewett*, 2 *Comst.*, 140; *Rensselaer Factory* agt. *Reid*, 5 *Cow.*, 587; *Cleveland* agt. *Burrill*, 25 *Barb.*, 538; *Viele* agt. *Troy and Boston R. R. Co.*, 21 *Barb.*, 396).

As the defendant in this case, under his option, had the right to postpone the performance of his contract until long after the dividends had been declared and the additional stock issued, it is very clear upon the principles laid down in the cases above . cited, that he could not have made default, so as to entitle the plaintiffs to these dividends and accretions, upon the mere ground that they had voluntarily agreed to pay interest from the date of their contract.

VII. The decision in the cases of *Courtney* agt. *Ferrers*, (1 *Simons*, 137, 1827); *Webster* agt. *Donaldson*, (34 *Beavan*, 451, 1865), *Terry* agt. *Wheeler*, (25 *N.Y.*, 520, 1862), turns upon the peculiar circumstances of each case.

In *Courtney* agt. *Ferrers* the assignment of the policy assigned "the policy *and all* moneys, benefits and advantages to arise, accrue or become due or payable upon or by virtue of it in any manner," and the vice chancellor therefore held that the whole fruits of the policy passed.

In *Webster* agt. *Donaldson* the plaintiff, in May, 1863, agreed to purchase an estate, including hay and crops, for £9,000—.The purchase was to be completed on the 24th of June, when plaintiff was to have possession, and if not then completed, the plaintiff was to pay interest at the rate of 3 per cent. on the purchase money *from that day.* By subsequent agreement, at the request of the *purchaser*, November was substituted for June. The contract was not concluded until February, following,when the plaintiff paid the purchase money, with interest only from the 29 *th of September,* 1863. In the meantime the vendors sold the hay and garden produce, and it was held that, under the altered contract, the plaintiff was not entitled to the hay or produce. The master of the rolls says: "I think that, having regard to the conditions of sale, the hay and growing crops were limited to those existing at the time of the conclusion of the sale; but as the purchaser was not to have possession until the purchase was completed, he could not properly gather the crops before that time."

And as the conditions, as varied, expressly stated that the purchaser is not to receive any of the rents or profits of the land until the 29th of September, the master very properly remarked, that there would be a manifest advantage given to a purchaser, by postponing the day for completion, if he were to have the crops exactly as if he had completed three months sooner, and yet escape payment of the three months' interest on the purchase money.

In *Terry* agt. *Wheeler* the title had passed, and SELDEN, J., made the remark quoted by plaintiffs' counsel to show that in a case of that kind the risk as well as the increase attends upon the title and not upon the possession.

In *Sheldon* agt. *Sherman*, (42 *Barb.*, 368), there was no contract of any kind, and the case was decided upon the principles of common justice. And, in *Scranton* agt. *Booth*, (29 *Barb.*, 171), where the parties differed in their understanding as to the rent agreed between them, it was held

that the tenant must pay what the premises were reasonably worth.

I cannot see how these two cases can be relied on as authority for the alteration of the plain terms of a written contract executed by both parties, or the interpolation of an additional obligation into the contract not contemplated by the parties at the time of its execution.

In *Messenger* agt. *The city of Buffalo* (21 *N.Y.*, 196) the city was held to have impliedly assented to the alteration of the contract, because by its action it had rendered the performance of the plaintiff's action impossible.

But what has the defendant in this case done so as to entitle the plaintiffs to an enlarged meaning of their contract?

In *Allamson* agt. *The mayor &c. of the city of Albany*, (43 *Barb.*, 33, 1854), the question simply was whether a covenant in the plaintiffs' contract "that the plaintiff will commence said work and will proceed therewith without delay, and in such a manner as not to delay the contractor for the mason-work," imposed upon the defendants the obligation to have the building in readiness for the plaintiff to perform the condition, and the court held that, unless it did, it would be a contract merely *on one side*, with no corresponding obligation, no duty to be performed on the part of the other contracting party.

To the same effect is *Churchward* agt. *Reg* (1 *C. L. Q. B.*, 173, 1865).

These cases merely decide that in some instances, where a contract would be void for want of mutuality, a correlative and corresponding obligation on the part of the other party will be implied, so far as it may become necessary for the purpose of sustaining the contract, but no more. But this doctrine cannot in any case be relied on as a justification for the imposition of a new, distinct, and additional obligation not embraced within the plain terms of a written

contract, which has been executed by both parties and which clearly defines their mutual rights and obligations.

The foregoing examination of the cases cited and relied upon by the plaintiffs wholly failed to disclose a principle or theory upon which the plaintiffs' claims would be sustained. On the other hand, the cases of *Decker* agt. *Furniss* (4 *Kern.*, 612), *Kelly* agt. *Upton* (5 *Duer*, 336), and *Spear* agt. *Hart* (3 *Robt.*, 420), are such direct authority for the proposition that the contract in this case is executory only; that the title did not pass, no matter how the plaintiffs considered it; that the dividends and additional stock follow the title as recognized by the company, and that consequently the plaintiffs notwithstanding their agreement to pay interest, are not entitled to the dividends and additional stock claimed by them; that the first three claims of the plaintiffs must be disallowed.

The fact that the plaintiffs, under their contract, made six deposits in the United States Trust Company, cannot make any difference in this respect, for two reasons:

*First*—Because the justice, who tried the cause, found as matter of fact, that said deposits were made as security for the performance of the contract only; and,

*Second*—Because, even if they had been made as payments on account, as earnest money to bind the bargain, the contract would not have been changed thereby; for the true legal effect of earnest money is simply to afford conclusive evidence that a bargain was actually completed with mutual intention that it should be binding on both contracting parties; and the inquiry whether the title to the property has passed in such case is to be tested not by the fact that earnest was given, but by the true nature of the contract concluded by the giving of the earnest.

As to the *fourth* claim of the plaintiffs—

If the defendant is liable at all, he is so for the simple breach of the contract to deliver the stock, the vendees not having paid to him the purchase money in advance. The

justice, at special term, has found, as matter of fact, that the six deposits made by the plaintiffs in the United States Trust Company, were made as security for the performance of the contract on their part, and this finding cannot be disturbed. The defendant had, until the 31st day of December, 1867, including the whole of that day, for the performance of the contract on his part, and I do not perceive how he could make default so as to incur a liability to respond in damages, except upon a tender of the purchase money made by the plaintiffs after that day. No such tender has been made. But, as this point has neither been raised nor discussed, it may not be fair to decide the case upon this ground.

If, then, there has been any breach on the part of the defendant, it must have occured, according to the evidence, either on the 19th or 31st day of December, 1867, and the measure of damages in such case is the difference between the contract price of the stock and the market price on the day of the breach, with interest from that day. (*Clark* agt. *Pinney*, 7 *Cowen*, 681; *Taylor* agt. *Read*, 4 *Paige*, 561; *Dey* agt. *Dox*, 9 *Wend.*, 129; *Davis* agt. *Shields*, 24 *Wend.*, 322; *Beals* agt. *Terry*, 2 *Sandf.*, 127; *Dana* agt. *Fiedler*, 2 *Kern*, 40; *Norton* agt. *Wales*, 1 *Robt.*, 568.)

The market value of the stock on these days, as proved, compares with the contract price as follows:

ON DECEMBER, 19th.

Contract price at 128, with interest thereon from February, 18, 1867, at six per cent.......................... 134 2-5
Market value.............................. 132$\frac{7}{8}$

ON DECEMBER 31st.

Contract price, with interest thereon from February 18, 1867, at six per cent...............................134$\frac{2}{3}$
Market value...............................131$\frac{5}{8}$

This comparison shows that the market value of the stock on either of said days was less than the contract price, and

consequently the plaintiffs, even if there was a breach by the defendant, sustained no actual damage.

The justice, at special term, was therefore right in holding that this rendered it unnecessary to consider whether there was such breach; and it follows that the exceptions taken and filed by the plaintiffs to the findings of said justice as well as to his refusal to find certain other facts, are, and every one of them is, clearly untenable.

The judgment appealed from should in all respects be affirmed, with costs.

MONELL, J.—I concur.